UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Stephen C., | |
| Plaintiff, | **1:22-cv-05989 (SDA)** |
| -against- | **OPINION AND ORDER** |
| Commissioner of Social Security,[1] | |
| Defendant. | |

**STEWART D. AARON, UNITED STATES MAGISTRATE JUDGE:**

Plaintiff Stephen C. ("Stephen" or "Plaintiff") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security (the "Commissioner") that denied his application for Disability Insurance Benefits ("DIB"). (Compl., ECF No. 1.) Now before the Court is Plaintiff's motion to remand this action to the Commissioner for further administrative proceedings. (Pl.'s Mot., ECF No. 59.) For the reasons set forth below, Plaintiff's motion is DENIED and the decision of the Commissioner is AFFIRMED.

**BACKGROUND**

**I.     Procedural Background**

Stephen filed an application for DIB on September 1, 2020, with an alleged onset date of November 5, 2019. (Administrative R., ECF No. 50 ("R."), 66, 235-26.) The Social Security Administration ("SSA") initially denied his application on November 17, 2020 and again, following

---

[1] The Complaint names Dr. Kilolo Kihakazi (correctly spelled Kijakazi), Acting Commissioner of Social Security, as a defendant. (*See* Compl.) Dr. Kijakazi no longer serves in that role. The Clerk of Court is respectfully requested to change the name of defendant in the caption to the Commissioner of Social Security, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

his request for reconsideration, on April 22, 2021. (R. 65-103, 115-26, 128, 133-44.) On May 11, 2021, Stephen filed a request for a hearing before an Administrative Law Judge ("ALJ"). (R. 145-46.) A telephonic hearing was held on August 16, 2021 before ALJ Sharda Singh. (R. 28-61.) Stephen was represented at the hearing by attorney. (R. 28, 30.) In a decision dated October 12, 2021, ALJ Singh found Stephen not disabled. (R. 10-22.) Thereafter, Stephen requested review of the ALJ's decision from the Appeals Council. (*See* R. 62-63, 234.) The Appeals Council denied the request on May 10, 2022, making ALJ Singh's decision the Commissioner's final decision. (R. 1-6.) This action followed.

II.    **Non-Medical Evidence**

Born on June 15, 1978, Stephen was 41 years old on the alleged onset date and 43 years old at the time of the ALJ hearing. (*See* R. 20, 30.) Stephen has a high school education, plus one year of college, and past relevant work as a police officer. (R. 20, 46.)

III.    **Medical Evidence Before the ALJ[2]**

On October 8, 2015, Stephen fell down some stairs at work and suffered injuries to his right shoulder and lower back. (R. 16, 893.) In January 2016, Stephen underwent surgery on his right shoulder, performed by Scott Levin, M.D. of Somers Orthopaedic Surgery and Sports Medicine Group, to repair his rotator cuff. (*See* R. 376-77, 380, 818, 1407.) On October 31, 2019, Stephen exacerbated his back pain after moving some boxes at work. (*See* R. 762.) He attempted to return to work on November 5, 2019, but experienced sharp low back pain and did not return to work. (*See id.*; *see also* R. 1155.)

---

[2] The Court focuses on the medical evidence from on or after the alleged onset date of November 5, 2019 through October 12, 2021, the date of the ALJ's decision.

Since at least January 2018, Stephen received treatment Ezriel Kornel, M.D. at Brain and Spine Surgeons of New York. (R. 677-86.) On November 7, 2019, Stephen saw Dr. Kornel for an office visit. (R. 678; *see also* R. 1060.) Dr. Kornel noted that "[Stephen's] back was tight over the summer, but with chiropractic care and exercises he was managing quite well." (R. 678.) However, he was cut off from physical therapy and chiropractic treatment and, two weeks prior to the visit, his back pain worsened making it difficult for him to sleep. (*Id.*) Dr. Kornel noted a positive straight leg raise on the right at 45 degrees, 5/5 strength and a normal gait. (*Id.*) Dr. Kornel further noted his impression as radiculopathy mild and discopathy with degenerative disc disease at L5-S1;[3] right far lateral herniation at L4-5 and degenerative facet disease at L3-4. (*Id.*) Dr. Kornel recommended a new MRI, as well as chiropractic treatment and muscle relaxant, and noted that Stephen may need an epidural steroid injection. (*Id.*) Dr. Kornel referred Stephen to a chiropractor. (R. 1058.)

On November 13, 2019, Stephen underwent an MRI of the lumbar spine at Northeast Radiology. (R. 689-90.) Radiologist Mark Glicklich, M.D. noted a stable MRI of the lumbar spine since January 25, 2019. (R. 690.) He further noted: developmental canal stenosis and spondylotic changes contributed to multilevel and multifactorial acquired central canal and foraminal stenosis, most notably toward the right at the L4-5 level; mild central canal stenosis at L3-4; mild central canal stenosis at L4-5; right foraminal/far lateral focal protrusion at L4-5 displacing the

---

[3] "The spine is comprised of five distinct spine segments, which include: (1) the cervical spine (neck) with seven vertebrae (C1-C7); (2) the thoracic spine (middle back) with twelve vertebrae (T1-T12); (3) the lumbar spine (lower back) with five vertebrae (L1-L5); (4) the sacrum (triangle-shaped bone connecting to the hips with five vertebrae (S1-S5); and (5) the coccyx (tailbone) with four vertebrae that compose the bone at the bottom of the spine." *Johnston v. Comm'r of Soc. Sec.*, No. 23-CV-05054 (SDA), 2024 WL 3442664, at *2 n.2 (S.D.N.Y. July 17, 2024) (citation omitted).

traversing right L4 root; mild central canal stenosis at L-5/S-1 with a small posterocentral protrusion mildly abutting the descending S1 roots, right greater than left. (*Id.*)

In addition to Dr. Kornel, Stephen also had been seeing Sathish Modugu, M.D. of the Sports Spine and Pain Treatment Center of Westchester approximately once per month since March 2018. (*See* R. 838.) In his first note following the alleged onset date, on November 22, 2019, Dr. Modugu noted, *inter alia*, shoulder impingement positive on the right, decreased range of motion in the lumbar spine, lumbar paraspinal tenderness, 5/5 muscle strength of major muscles innervated by the lumbar spine, except weakness in the right foot dorsiflexors, positive straight leg test on the right and positive facet loading on the right. (R. 892, 894-95.)

In his assessment, much of which was carried over from prior visits, Dr. Modugu noted that Stephen continued to have pain in his right shoulder, requiring ongoing treatment, and would have a trial of Flector patches. (R. 895.) With respect to his back pain, Dr. Modugu noted that Stephen had L5-S1 spondylolisthesis and a right-sided L4-5-disc herniation compressing the L4 nerve root, which was accompanied by clinical signs of weakness of the right foot dorsiflexors. (*Id.*) Dr. Modugu noted that electrodiagnostic studies had been normal and authorization for epidural injections had been denied. (*Id.*) Sudomotor testing had been performed to exclude Reflex Sympathetic Dystrophy ("RSD")[4] and was negative. (*Id.*) Stephen also tried trigger injections, which relieved spasms but his pain remained constant. (*Id.*) He also had gone to chiropractic care with benefit. (*Id.*) Dr. Modugu indicated that Stephen had been using Tramadol

---

[4] RSD, also known as Complex Regional Pain Syndrome, is a syndrome characterized by a continuing (spontaneous and/or evoked) regional pain that is seemingly disproportionate in time or degree to the usual course of any known trauma or other lesion. *See* Complex Regional Pain Syndrome, https://pmc.ncbi.nlm.nih.gov/articles/PMC9186375/ [https://perma.cc/TU9U-JL9K].

for pain since September 2019, but his pain remained constant. (*Id.*) He further noted that Stephen had more back pain when he had returned to light duty work (most recently, between April 1, 2019 and November 5, 2019) and was sitting for long periods. (*Id.*) Dr. Modugu added that Stephen had a new MRI and would see a surgeon the following week. (*Id.*)

Dr. Modugu further noted that Stephen's diagnoses, which had remained unchanged since March 2018, were low back pain, radiculopathy (lumbar region) and pain in right shoulder. (R. 896; *see also* R. 1008.) Dr. Modugu also completed a pain assessment, in which Stephen reported that his functioning remained the same, his pain averaged an 8/10 during the past week, his pain had been relieved approximately 35% and that his pain relief was making a difference. (R. 1062-64.) Thus, Dr. Modugu continued the same regimen. (R. 1064.)

During a follow-up visit on November 25, 2019, Dr. Kornel noted that the November 13, 2019 MRI was unchanged with lateral herniation at L4-5 on the right and a central herniation at L5-S1 with a small right lateral component. (R. 677; *see also* R. 695.) Dr. Kornel wrote, "[i]t is likely that the [L4-5] lateral herniation is causing the [right] thigh pain and contributing to the back pain and the [L5-S1] is causing back pain." (*Id.*) Dr. Kornel further noted that he felt it was "crucial that [Stephen] have physical therapy as well as chiropractic [treatment] to keep the need for surgical intervention at bay." (*Id.*)

Stephen saw Dr. Modugu again on December 16, 2019 for a trigger point injection. (R. 886-91.) Dr. Modugu noted that he had failed conservative care, thus presenting for a trigger point injection to control his pain. (R. 890.) Dr. Modugu otherwise noted the same physical examination findings and assessed Stephen as medically stable. (R. 888-90.)

On December 24, 2019, Stephen attended an evaluation for physical therapy of his lower back and began attending physical therapy approximately twice per week. (*See* R. 1238 (February 25, 2020 note referencing earlier evaluation and ongoing visits).) On January 3, 2020, Stephen saw chiropractor Joseph Olmo, D.C. for treatment. (R. 1189-90.) Dr. Olmo noted that Stephen presented at his office with an exacerbation of severe low back pain and stiffness after moving some boxes at work on October 31, 2019. (R. 1191.) Dr. Olmo noted that standing for more than thirty minutes exacerbated Stephen's condition and lying on his back was palliative. (*Id.*) Stephen's condition was constant, and he could not stand more than 30 minutes at a time or lift over 25 pounds. (*Id.*) Stephen described sharp pain at 4/10. (*Id.*) Dr. Olmo recommended that Stephen take frequent breaks when sitting and should stand up every 20 minutes. (*Id.*) Dr. Olmo noted reduced lumbar flexion and extension, with some improvement following treatment. (*Id.*) Dr. Olmo further noted that Stephen would receive treatment twice a week for four weeks with a reexamination to follow every four weeks, and that he should ice and rest at home. (*Id.*) Stephen saw Dr. Olmo for chiropractic treatment again on January 6, 2020. (R. 760-62; *see also* R. 827-29, 1184-86.)

On January 8, 2020, Stephen saw neurological surgeon Richard Kanoff, D.O., for an independent neurosurgical evaluation in connection with his worker's compensation claim. (R. 1154-61, 1168-77.) Stephen described his back pain as constant and 7/10. (R. 1154-55.) Stephen reported bilateral lower extremity radicular pain that extended to his thigh and, at night, extended to the calf. (R. 1155.) Following a physical examination, Dr. Kanoff noted the following impressions: lumbar somatic dysfunction/mechanical back pain; lumbar radiculitis without radiculopathy; and lumbar disc disease with disc herniations. (R. 1158.) Dr. Kanoff opined that

Stephen had never fully recovered from the 2015 incident and, in the years since, had suffered from a series of atraumatic exacerbations, including the most recent one. (R. 1158-59; *see also* R. 1154.) Dr. Kanoff recommended that Stephen continue physical therapy for another eight weeks "to maximize his conservative therapy attempts to reduce his symptoms to the point where he may be able to return to work and avoid surgery." (R. 1159.) For purposes of worker's compensation, Dr. Kanoff opined that Stephen was "totally disabled from all vocational activities, including sedentary work." (*Id.*)

Stephen saw Dr. Olmo for regularly scheduled chiropractic treatment on January 10, 2020. (R. 1217-19.) The following week, on January 13, 2020, Stephen saw Dr. Modugu for a follow-up visit. (R. 881-85; *see also* R. 1212-16.) Dr. Modugu documented no new findings. (*See* R. 881-85.) Dr. Modugu completed another pain assessment, in which Stephen reported that his functioning remained the same, his pain averaged 7/10 during the past week, his pain had been relieved approximately 35% and that his pain relief was making a difference. (R. 1052-54.) Thus, Dr. Modugu continued the same regimen. (R. 1054.)

Stephen continued to see Dr. Olmo for chiropractic treatment throughout January 2020. (*See* R. 1208-10 (January 13, 2020); 1200-02 (January 17, 2019[5]); 1203 (partial note referencing January 27, 2020 visit).) During the January 27, 2020 visit, Dr. Olmo noted that Stephen showed a decrease in pain and an increase in active range of motion after treatment. (R. 1203.) Dr. Olmo discharged Stephen from care "for this exacerbation" and recommended home exercises three times per week. (*Id.*) Stephen also continued to attend physical therapy throughout February

---

[5] The note is misdated January 17, 2019, but the progress report reflects the correct date. (*See* R. 1200-02.)

2020. (R. 836, 1238-41.) A physical therapy re-evaluation from February 25, 2020, notes that Stephen reported decreased pain and increased lower back flexibility since the last evaluation, but continued to experience bilateral radicular pain, left greater than right, down into the posterior knee region. (R. 1238.) The plan of care indicated that Stephen was to continue with physical therapy twice per week for another five weeks. (R. 836; *see also* R. 1228, 1230-31.)

During a follow-up visit on March 10, 2020, Dr. Modugu documented the same examination findings and assessment as in prior visits and noted that Stephen presented as medically stable and reported pain relief from physical therapy. (R. 876-80; *see also* R. 1046-48, 1223-27.) On April 2, 2020, Stephen underwent another MRI of the lumbosacral spine. (R. 1284-85.) Peter Waxman, M.D. noted the following impression: right intraforaminal/far lateral L4-5 disc protrusion with contact of the existing right L-4 nerve root; posterocentral and bilateral posterior paracentral L5-S1 disc extrusions with contact of the proximal transversing S-1 nerve roots. (R. 1285.)

Dr. Modugu spoke to Stephen via telephone on April 6, 2020. (R. 871-74; *see also* R. 1280-83.) Dr. Modugu noted that there had been an increase in disc size at L4-5 and surgery was being considered. (R. 874.) In the interim, Stephen was managing symptomatically with Valium. (*Id.*)

On April 13, 2020, Dr. Kornel spoke with Stephen via telephone after reviewing his MRI images. (R. 391-93; *see also* R. 721-23, 1276-78.) Dr. Kornel reported that the images showed that his L5-S1 herniation had worsened and that it was clear that his best option was to proceed to discectomies and fusions at L4-5 and L5-S1. (R. 393.) Stephen expressed his understanding and that he wished to proceed with surgery. (*Id.*) The same day, Stephen also spoke to Dr. Modugu via telephone. (R. 866-70.) Stephen reported ambulating easier that week and Dr. Modugu noted

that they would treat symptomatically until more definitive treatment was possible. (R. 869.) Dr. Modugu sent medication with a note to follow up in one month. (*Id.*) The following day, on April 14, 2020, Dr. Kornel's office faxed a request for lumbar fusion surgery to workers' compensation. (R. 833.)

Dr. Modugu spoke with Stephen again via telephone on May 19, 2020 and June 30, 2020. (R. 830-31, 856-65; *see also* R. 1258-61, 1265-68.) Both times, Dr. Modugu noted that Stephen had reported no changes since his last visit and otherwise reiterated his note from the April 13, 2020 telephone call. (R. 859, 864; *see also* R. 1272-75.)

On July 22, 2020, Stephen saw Dr. Kanoff for an independent neurosurgical re-evaluation in connection with his worker's compensation claim. (R. 1030-36, 1250-53, 1332-36.) Following a physical examination, Dr. Kanoff noted the same impressions as his first evaluation and explained that he agreed with Dr. Kornel's recommendation for surgery. (R. 1036.) For purposes of worker's compensation, Dr. Kanoff opined that Stephen was 100% disabled. (*Id.*)

Dr. Modugu spoke again with Stephen on August 6, 2020. (R. 851-55; *see also* R. 1328-31.) Dr. Modugu's note remained the same as his prior visit, except he added that Stephen requested refills of Ultracet.[6] (R. 854.) The next follow-up call occurred on September 9, 2020, following which Dr. Modugu entered an identical note as the prior visit. (R. 844-50; *see also* R. 1323-26.)

---

[6] Ultracet is a brand name for a combination product containing Tramadol and acetaminophen. *See Tavarez v. Berryhill*, No. 15-CV-05141 (CS) (LMS), 2019 WL 1965832, at *3 n.9 (S.D.N.Y. May 1, 2019) (citation omitted). Although Stephen's records often refer simply to Tramadol, his specific prescription may have been for Ultracet instead. (*See, e.g.*, R. 1056.)

On October 5, 2020, Dr. Modugu saw Stephen for an in-person follow-up visit. (R. 842-45; *see also* R. 1020-28, 1318-21.) Dr. Modugu's assessment noted that current injections helped reduced Stephen's pain by at least 50%. (R. 844.) Dr. Modugu also noted that Stephen was medically stable, but still had back pain towards the evening and his shoulder felt the same with limited mobility. (R. 845.) During a follow-up call on October 16, 2020, Stephen's status was unchanged, except that he requested a refill of Tramadol, which Dr. Modugu sent to the pharmacy. (R. 1312-15.)

Dr. Modugu spoke with Stephen again on November 9, 2020. (R. 1307-10; *see also* R. 1487-90.) Dr. Modugu again noted that Stephen was medically stable with back pain towards the evening, but his shoulder felt well with occasionally radiating pain. (R. 1309.) Stephen requested a refill of Tramadol, which Dr. Modugu sent to the pharmacy with a note to follow up in one month. (*Id.*)

On November 9, 2020, Stephen saw Julia Kaci, M.D. for an internal medicine consultative examination. (R. 1116-22.) On physical examination, Dr. Kaci noted that Stephen appeared to be in no acute distress. (R. 1117.) Dr. Kaci noted that Stephen's gait was a little slow because his back felt tight and stiff when he started walking, which he reported happened if he sat for too long. (*Id.*) Dr. Kaci noted that he could walk on heels and toes without difficulty, squat full with help (holding onto the exam table), had a normal stance, did not use any assistance device, did not need help changing for the exam, was able to rise from a chair without difficulty, but had some trouble getting off of the exam table due to back pain. (*Id.*)

Dr. Kaci noted full flexion, extension, lateral flexion bilaterally and fully rotary movement bilaterally for the cervical spine. (R. 1118.) For the lumbosacral spine, she noted spine flexion 45

degrees, extension 20 degrees, lateral flexion 25 degrees on the left and full on the right, and rotation full bilaterally. (*Id.*) A straight leg raise was positive at 30 degrees bilaterally in the supine and seated positions. (*Id.*) With respect to the right shoulder, Dr. Kaci noted shoulder forward elevation 100 degrees, abduction full, adduction full, internal rotation 30 degrees, and external rotation full. (*Id.*) On neurologic examination, Dr. Kaci found no sensory deficit and 5/5 strength in the upper and lower extremities. (*Id.*) Hand and finger dexterity were intact with grip strength 5/5 bilaterally. (*Id.*)

Dr. Kaci ordered X-rays of the lumbosacral spine and the right shoulder. (R. 1119.) The right shoulder X-ray revealed no significant or acute osseous abnormality. (R. 1120.) The lumbar spine X-ray also revealed no significant or acute osseous abnormality. (R. 1121.) Dr. Kaci recorded the following diagnoses: chronic lower back pain, radiculopathy, chronic right shoulder pain, status post-surgery, and elevated blood pressure without hypertension. (R. 1119.) Based on Stephen's history and her examination, Dr. Kaci opined that Stephen had moderate limitations to lifting, carrying, pushing, pulling, prolonged standing, walking, bending, kneeling, squatting, and climbing stairs. (*Id.*)

The same day, Stephen saw psychiatrist Melissa Antiaris, Psy.D. for a psychiatric consultative examination. (R. 1125-28.) Stephen reported that he was somewhat depressed because he could not do the things that he used to do. (R. 1125.) He denied any suicidal or homicidal ideation. (*Id.*) Stephen also reported feeling worried that his back was going to "go out again." (*Id.*) Stephen denied panic, mania, or thought disorder symptoms. (*Id.*) He reported lately having some difficulty with short term memory and, when he was in a lot of pain or taking medication, he could not concentrate. (R. 1125-26.) On mental status examination, Dr. Antiaris

noted that Stephen was cooperative and related adequately. (R. 1126.) His affect was full; his mood was euthymic and his attention, concentrate and recent and remote memory skills were intact. (*Id.*) Dr. Antiaris judged his cognitive functioning to be in the average range and noted that his insight and judgment were good. (R. 1127.)

Dr. Antiaris noted that Stephen could dress, bathe, and groom himself and do light cooking and laundering. (R. 1127.) He also could manage his funds and drive. (*Id.*) In her medical source statement, Dr. Antiaris found no limitations in Stephen's ability to understand, remember, or apply simple or complex directions and instructions; no limitations in his ability to use reason and judgment to make work-related decisions; no limitations in his ability to interact adequately with supervisors, coworkers, and the public; no limitations in his ability to sustain concentration and perform a task at a consistent pace, or sustain an ordinary routine and regular attendance at work; no limitations in his ability to regulate emotions, control behavior, and maintain well-being; and no limitations in his ability to maintain personal hygiene or be aware of normal hazards. (*Id.*) Dr. Antiaris concluded that the results of the examination did not appear to be consistent with any psychiatric or cognitive concerns that would significantly interfere with Stephen's ability to function on a daily basis. (*Id.*)

On December 2, 2020, Stephen saw Dr. Kanoff for an independent neurosurgical re-evaluation in connection with his worker's compensation claim. (R. 1287-99, 1387-92, 1460-85.) Dr. Kanoff noted that Stephen had not yet undergone the recommended surgery because he was feeling anxious about it, but was taking Tramadol and receiving chiropractic treatment. (R. 1295.) Following a physical examination, Dr. Kanoff noted the same impressions as his prior two evaluations and indicated that he would need to decide about surgery and that everything else

would be directed to symptomatic relief. (R. 1297.) For purposes of workers' compensation, Dr. Kanoff opined that Stephen was 100% disabled, such that he could not return to work even with restrictions. (R. 1298.)

On December 21, 2020, Stephen spoke with Dr. Modugu via telephone. (R. 1383-86, 1456-59.) Dr. Modugu reviewed Stephen's symptoms and refilled his prescription for Ultracet. (R. 1385-86.) Stephen continued to see Dr. Olmo for chiropractic treatment approximately twice per week in January 2021. (R. 1370-81, 1441-49, 1518-20.) Following a telephone consultation on February 4, 2021, Dr. Modugu again refilled his prescription for Ultracet. (R. 1366-69, 1451-54.) On March 3, 2021, Stephen soke to Dr. Modugu again and reported no new changes. (R. 1360-63, 1514-17.) Stephen requested a refill of Tramadol, which Dr. Modugu approved. (R. 1363.)

On April 9, 2021, Dr. Kanoff prepared an addendum to his December 2, 2020 report. (R. 1348-52, 1432-40, 1493-1507.) Dr. Kanoff noted that he was asked to review video surveillance of Stephen from three different dates between March 28, 2019 and February 5, 2021, depicting Stephen doing things such as walking to and from his car, getting into and out of his car, driving, pulling what seemed to be empty trash bins, carrying a bird house and walking his small dog, as well as getting into and out of the bed of his truck. (R. 1349.) Dr. Kanoff reiterated his view that Stephen needed lumbar surgery, which Stephen was contemplating, and that he had significant activity intolerances with sitting, standing and walking, none of which Dr. Kanoff found were contradicted by the video clips provided. (*Id.*) Dr. Kanoff concluded that, barring any significant changes in Stephen's clinical status, his prior opinions about Stephen's disability remained unchanged. (*Id.*)

Between April and June 2021, Stephen saw Dr. Modugu once per month, primarily to refill his prescription. (R. 1355-58, 1401-04 1423-26, 1428-31, 1509-12.) On June 9, 2021, Stephen saw Dr. Kornel for a follow-up visit. (R. 1421.) Dr. Kornel noted "no real change" in Stephen's condition, with back pain more to the right, especially with exertion and at the end of the day, and intermittently down the right lateral thigh. (*Id.*) Dr. Kornel noted that Stephen was managing with Tramadol. (*Id.*) Dr. Kornel assessed mild decreased flexion in the lumbar spine, strength 5/5, positive straight leg test on the right at 45 degrees mild and normal gait. (*Id.*) Dr. Kornel concluded that Stephen should continue pain management and return to the office if his pain significantly worsened or he developed a neurological deficit. (*Id.*)

On June 15, 2021, Stephen saw Dr. Levin for an evaluation of right shoulder pain. (R. 1406-10, 1414-17, 1419.) On physical examination of the right shoulder, Dr. Levin noted no tenderness to palpation, active forward flexion to 160 degrees; active external rotation at his side to 60 degrees; internal rotation to the low lumbar level; 5/5 strength; mildly positive Neer impingement sign; positive Hawkins impingement sign; positive Whipple test; intact sensation in all nerve distributions of right upper extremity; 2+ radial pulse and positive EPL and FPL. (R. 1408.) Dr. Levin obtained X-rays of the right shoulder, which did not demonstrate any obvious bony abnormalities. (*Id.*) Dr. Levin gave Stephen a steroid injection, prescribed physical therapy 2-3 times per week for six weeks, and scheduled a follow-up in four weeks for reevaluation. (R. 1409.)

Dr. Levin saw Stephen again on July 12, 2021. (R. 1397-99.) Dr. Levin noted that Stephen was doing well overall, and that the steroid injection seemed to help him quite a bit. (R. 1398.) Dr. Levin noted that Worker's Compensation had not approved physical therapy, and Stephen was trying to do exercises on his own, but he was having "more issues" with his low back pain,

which was limiting his ability do the exercises. (*Id.*) However, Dr. Levin found that Stephen's right shoulder seemed to be improving, and he no longer was getting radiating pain down his right upper arm. (*Id.*)

On physical examination of the right shoulder, Dr. Levin noted no tenderness to palpation, active forward flexion to 150 degrees; active external rotation at his side to 70 degrees; internal rotation to the right sacroiliac joint;  5/5 strength to resisted shoulder abduction and external rotation; 4+/5 strength to resisted shoulder internal rotation; positive Neer impingement sign; positive Hawkins impingement sign; and negative Whipple test. (R. 1398.) Dr. Levin found that Stephen seemed to be improving and noted that he would like Stephen to continue to do exercises for his right shoulder on his own. (R. 1399.) Dr. Levin indicated that Stephen should follow up with him in the future as needed based on his symptomology. (*Id.*)

## IV.    The August 16, 2021 Administrative Hearing

During the August 16, 2021 administrative hearing, Stephen testified that, due to pain and lower back spasms, he "couldn't move" with a different tolerance every day. (R. 33.) On bad days, Stephen testified that he couldn't really dress himself or get out of bed and he would experience shooting, stabbing pain throughout his lower back. (R. 34.) Approximately once per month he would experience a spasm that would affect him for a couple of days. (*Id.*) He also had mild spasms throughout a typical month, for which muscle relaxers helped him function. (R. 35.) On a typical day, Stephen would walk around for a little while to loosen up his back, as well as using a heating pad and/or stimulation machine, and then try to do some light things around the house such as light laundry or putting away dishes, though it was difficult for him to bend repeatedly. (R. 36; *see also* R. 37-38.) Then, Stephen would go outside and sit before using the

heating pad again to loosen up his back if he had been too sedentary. (R. 36-37.) Later in the day, Stephen would cook dinner, get his kids to bed, use the heating pad again and shower, during which he could sit on a bench. (R. 37.) He did not leave the house often during the week. (*Id.*)

Stephen testified that he experienced some side effects from medication a few times per month, such as muscle relaxers clouding his concentration. (R. 39-40.) With respect to his ability to lift and carry, Stephen testified that he could normally lift about ten pounds, but that constant bending would cause his back to flare up, and that he could lift and carry, at most, 25 pounds. (R. 40, 50.)

Stephen further testified that he could walk for a few minutes before his back would start acting up and could sit for about 15 minutes before his back would start tightening. (R. 40-41.) Once he has been standing, he needs to sit for between 15 and 30 minutes before getting up again. (R. 41.) After sitting for about 15 minutes, he would need to sand up and walk around for about ten minutes. (R. 48.) Stephen also testified that he had difficulty sleeping due to shoulder and/or back pain. (R. 42.) With respect to his shoulder, Stephen further testified that he had difficulty reaching overhead. (R. 43.) He could get dressed by himself but sometimes needed help if he had mild or medium spasms. (R. 51.)

As for psychological conditions, Stephen testified that he always had worked and been busy and that it was depressing for him "to be not able to do much." (R. 44.) However, he testified that he did not take any medications and was not receiving counseling or therapy. (R. 48.) He testified that he did not have any hobbies at that time because the things he used to do were no longer feasible. (R. 51.) Finally, Stephen testified that surgery was "still on the table" but he was

concerned because a friend had had the same surgery, and it was a "complete failure" and had made his friend's pain worse. (R. 52-53.)

Vocational expert ("VE") Jay Steinbrenner also testified at the hearing. (R. 53-59.) The ALJ asked VE Steinbrenner to assume a hypothetical individual with the same age, education and past work experience as Stephen, who was limited to a sedentary exertional level, could never climb ladders, ropes or scaffolds, occasionally climb ramps, stairs, balance, stoop, kneel, crouch and crawl, and who required a sit/stand option after 30 minutes, having to stand up for one to two minutes and then sit back down, and who was limited to reaching with the right upper extremity frequently and was to avoid hazards such as moving machinery, and asked whether such an individual could perform Stephen's past work. (R. 54-55.) VE Steinbrenner testified that, based upon those limitations, the hypothetical individual could not perform any past relevant work. (R. 55.) However, VE Steinbrenner testified that there were other jobs in the national economy that such individual could perform, including telephone solicitor and telephone survey work. (R. 55-56.) VE Steinbrenner also testified that a person with the additional limitation of needing to take unscheduled breaks outside of the normal eight-hour breaks, resulting in an individual being off task for more than 15 percent of a workday, would not be able to perform any past work or any other jobs. (R. 56.)

VE Steinbrenner further testified that, going back to the first hypothetical person, but changing the reaching limitation to occasionally and adding a limitation to pushing and pulling with the right upper extremity only occasionally, the individual could not perform Stephen's past work, but could perform the telephone solicitor and telephone survey work as well as the job of surveillance systems monitor. (R. 56-57.) Stephen's attorney asked VE Steinbrenner about

employer tolerance for an employee being off task as well as absenteeism, to which VE Steinbrenner testified that off task maxed out at 15 percent and the threshold for absenteeism was two days per month, but an employee who missed two days every month would eventually be terminated. (R. 58-59.)

## V.    The ALJ's Decision

Applying the Commissioner's five-step sequential evaluation, *see infra* Legal Standards, at step one, the ALJ found that Stephen had not engaged in substantial gainful activity since the alleged onset date of November 5, 2019. (R. 12-13.) At step two, the ALJ found that Stephen had severe impairments of degenerative disc disease of the lumbar spine, lumbar radiculitis, status post-operative arthroscopy of the right shoulder, osteoarthritis of the glenohumeral and acromioclavicular ("AC") joints of the right shoulder and impingement syndrome of the right shoulder. (R. 13-14.) At step three, the ALJ found that Stephen's impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, including Listings 1.15 (disorders of the skeletal spine resulting in compromise of a nerve root), 1.16 (lumbar spinal stenosis resulting in compromise of the cauda equina), 1.17 and 1.18 (both relating to abnormality of major joints). (R. 14-15.)

Prior to proceeding to step four, the ALJ found that Stephen retained the Residual Functional Capacity ("RFC") to perform sedentary work, as defined in 20 C.F.R. § 404.1567(b), except that he could occasionally climb ramps and stairs; occasionally balance, stoop, kneel crouch and crawl; could never climb ladders, ropes or scaffolds; after 30 minutes of sitting could stand for one to two minutes before returning to a seated position; could occasionally reach in

all directions with the right upper extremity and occasionally push and pull with the right upper extremity; and should avoid hazards such as moving machinery. (R. 15-19.)

At step four, the ALJ found that Stephen was not able to perform his past relevant work as a police officer. (R. 19-20.) At step five, the ALJ considered Stephen's age, education, work experience and RFC and concluded, based on VE Steinbrenner's testimony, that there were jobs existing in significant numbers in the national economy that Stephen could perform, including Phone Solicitor (Dictionary of Occupational Titles ("DOT") Code 299.357-014), Telephone Survey Worker (DOT Code 205.267-054) and Surveillance Systems Monitor (DOT Code 379.367-010). (R. 20-21.) Therefore, the ALJ found that Stephen was not under a disability as defined under the Act at any time between November 5, 2019 and October 12, 2021, the date of the ALJ's decision. (R. 21.)

**LEGAL STANDARDS**

I.    **Standard Of Review**

In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

"The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence." *Ulloa v. Colvin*, No. 13-CV-04518 (ER), 2015 WL 110079, at *6 (S.D.N.Y. Jan. 7, 2015) (citing *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999)). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision[.]" *Id.*; *accord Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987). A court must set

aside legally erroneous agency action unless "application of the correct legal principles to the record could lead only to the same conclusion," rendering the errors harmless. *Garcia v. Berryhill*, No. 17-CV-10064 (BCM), 2018 WL 5961423, at *11 (S.D.N.Y. Nov. 14, 2018) (quoting *Zabala v. Astrue*, 595 F. 3d 402, 409 (2d Cir. 2010)).

Absent legal error, the ALJ's disability determination may be set aside only if it is not supported by substantial evidence. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (vacating and remanding ALJ's decision). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). However, "[t]he substantial evidence standard is a very deferential standard of review—even more so than the clearly erroneous standard, and the Commissioner's findings of fact must be upheld unless a reasonable factfinder *would have to conclude otherwise*." *Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), *as amended* (Apr. 30, 2019) (summary order) (emphasis in original) (citation and internal quotation marks omitted). If the findings of the Commissioner as to any fact are supported by substantial evidence, those findings are conclusive. *Diaz v. Shalala*, 59 F.3d 307, 312 (2d Cir. 1995).

## II.    <u>Determination Of Disability</u>

A person is considered disabled for benefits purposes when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not

only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

In determining whether an individual is disabled, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam) (citations omitted).

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . [continuous period of 12 months], or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 [(the "Listings")] . . . and meets the duration requirement, we will find that you are disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520(a)(4) (internal citations omitted).

If it is determined that the claimant is or is not disabled at any step of the evaluation process, the evaluation will not progress to the next step. 20 C.F.R. § 404.1520(a)(4).

After the first three steps (assuming that the claimant's impairments do not meet or medically equal any of the Listings), the Commissioner is required to assess the claimant's RFC "based on all the relevant medical and other evidence in [the claimant's] case record." 20 C.F.R. § 404.1520(e). A claimant's RFC is "the most [the claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 404.1545(a)(1).

The claimant bears the burden of proof as to the first four steps. *See Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999). It is only after the claimant proves that he cannot return to work that the burden shifts to the Commissioner to show, at step five, that other work exists in the national and local economies that the claimant can perform, given the claimant's RFC, age, education, and past relevant work experience. *See id.* at 51-52.

## III.   **Regulations Regarding Consideration Of Medical Opinions And Prior Findings**

Under the regulations applicable to applications filed on or after March 27, 2017, which apply to Plaintiff's claim, the ALJ considers five factors in evaluating the persuasiveness of medical opinions: (1) supportability; (2) consistency; (3) relationship of the source with the claimant, including length of the treatment relationship, frequency of examination, purpose of the treatment relationship, extent of the treatment relationship and whether the relationship is an examining relationship; (4) the medical source's specialization; and (5) other factors, including but not limited to "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the SSA] disability program's policies and evidentiary

requirements." 20 CFR § 404.1520c(c). Using these factors, the most important of which are supportability and consistency, the ALJ must articulate "how persuasive [he] find[s] all of the medical opinions and all of the prior administrative medical findings in [the claimant's] case record." *Id.* § 404.1520c(b).

## DISCUSSION

Plaintiff's motion, which is devoid of any real argument or analysis, asserts that the ALJ did not correctly review and weigh the medical evidence, allowing a denial that was not supported by substantial evidence.[7] (*See* Pl.'s Mot. at 2-5.) In response, the Commissioner argues that the ALJ applied the correct legal standards and the ALJ's decision is supported by substantial evidence. (Comm'r Br. at 1-18.)

## I.    The ALJ's RFC Determination

It is well settled that the RFC "is an administrative finding, not a medical one." *Christopher H. v. Comm'r of Soc. Sec.*, No. 20-CV-01463 (DB), 2022 WL 2109180, at *4 (W.D.N.Y. June 10, 2022); *see also* 20 C.F.R. § 404.1527(d)(2) (indicating that "the final responsibility for deciding these issues [including RFC] is reserved to the Commissioner"). Thus, an ALJ is tasked with weighing the evidence in the record and reaching an RFC finding based on the record as a whole.

---

[7] To the extent Plaintiff states in the Statement of Facts that "the Commissioner erred . . . by allowing a record at [the] hearing that was not fully developed" (Pl.'s Mot. at 2), Plaintiff does not elaborate on this argument or identify any way in which the record was deficient or not fully developed. "The ALJ's duty to develop the record "encompasses not only the duty to obtain a claimant's medical records and reports but also the duty to question the claimant adequately about any subjective complaints and the impact of the claimant's impairments on the claimant's functional capacity." *Rhone v. Berryhill*, No. 16-CV-07213 (CM) (SDA), 2018 WL 1282823, at *6 (S.D.N.Y. Mar. 8, 2018) (cleaned up). However, "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Rosa*, 168 F.3d at 79 n.5 (internal citation omitted). The Court agrees with the Commissioner that the record was sufficiently developed. (Comm'r Br., ECF No. 62, at 13.)

*See Tricarico v. Colvin*, 681 F. App'x 98, 101 (2d Cir. 2017). It is within the ALJ's discretion to resolve genuine conflicts in the evidence. *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002).

Plaintiff contends that the ALJ failed to properly review the medical evidence and "improperly found that Plaintiff could return to past relevant work in a light capacity." (Pl.'s Mot. at 4.) Plaintiff also asserts, in a conclusory manner, that the combined effects of Plaintiff's conditions[8] effectively eliminated his ability to perform substantial gainful activity from November 5, 2019 to the present. (*See id.*) Plaintiff's first argument is misplaced because the ALJ did not find that Stephen could return to past relevant work or that he could perform light work. Rather, as the Commissioner points out, the ALJ found that Stephen could *not* return to his past relevant work as a police officer and that he was limited to sedentary work with additional limitations. (*See* Comm'r Br. at 10; *see also* R. 15-20.) Plaintiff does not articulate any specific ways in which he contends the ALJ failed to properly review the medical evidence.

Having reviewed the record, the Court agrees with the Commissioner that the ALJ's RFC determination is supported by substantial evidence. (*See* Comm'r Br. at 10-14.) The ALJ considered the medical evidence in the record, including objective medical evidence and treatment notes from Stephen's treating physicians. (R. 16-17.) With respect to Stephen's shoulder impairment, the ALJ discussed the most recent film studies noting no evidence of significant joint effusion or other acute osseous abnormality and Stephen's treatment records, which did not include abnormal findings or otherwise suggest limitations in his ability to perform manipulative activities with his upper extremities. (*See id.*) The ALJ took into account evidence

---

[8] Plaintiff's motion at first misstates Plaintiff's severe impairments (Pl.'s Mot. at 3), but the correct impairments later are listed on page 4. (*Id.* at 4.)

and testimony regarding Stephen's difficulty in reaching overhead and raising his right upper extremity in formulating his RFC. (R. 17.) With respect to Stephen's severe back impairments, the ALJ discussed his MRI scans and physical examination findings, which showed that his symptoms had been responsive to and stable with pain management. (R. 16-17.) For example, the ALJ cited to Dr. Kanoff's December 2020 report indicating that surgery, while recommended, remained elective due to the absence of any major neurologic deficits, as well as the most recent note from Dr. Kornel in June 2021, indicating that Stephen was managing with Tramadol and should continue pain management. (R. 17 (citing R. 1421, 1472).) However, given the frequency and intensity of Stephen's symptoms and records and his testimony indicating that his symptoms worsened with prolonged sitting or standing, the ALJ included additional limitations in the RFC, including a limitation that after 30 minutes of sitting, Stephen could stand for one to two minutes before returning to a seated position. Again, Plaintiff does not identify how the ALJ's review of the medical evidence was incomplete or erroneous.

The ALJ also discussed medical opinions from the consultative examiners and state agency medical consultants and discussed the supportability and consistency of these opinions with the medical evidence in the record. (R. 18-19; *see also* Comm'r Br. at 11-12.) The ALJ found Dr. Kaci's opinion that Stephen had moderate limitations in physical functioning to be "generally persuasive" as it was internally consistent and supported by her examination and imaging. (R. 18.) The ALJ also found that the state agency consultants' opinions were "generally persuasive" as they were consistent with other evidence in the record, including Dr. Kaci's examination findings, and supported by objective medical evidence such as MRI scans. (R. 19.) The ALJ ultimately concluded, however, that Stephen had further limitations beyond those assessed by

Dr. Kaci or the state agency consultants and incorporated additional limitations into the RFC determination. The Court finds no error in the ALJ's weighing of the medical opinion evidence. *See Terry T. v. Comm'r of Soc. Sec.*, No. 24-CV-09968 (GRJ), 2025 WL 2205934, at *4 (S.D.N.Y. Aug. 3, 2025) (ALJ properly reconciled medical opinion evidence in formulating RFC that was more restrictive than medical opinions in record); *see also Baker v. Berryhill*, No. 15-CV-00943-MAT, 2018 WL 1173782, at *4 (W.D.N.Y. Mar. 6, 2018) ("[R]emand is generally not warranted where the ALJ's RFC finding is more restrictive than the limitations set forth in the medical opinions of record.").[9]

Although Stephen may disagree with the ALJ's overall weighing of the medical evidence, the Court must defer to the ALJ's resolution of conflicting evidence. *See Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012); *see also McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.") (citation omitted). Moreover, with respect to the facts found by the ALJ, Stephen has not demonstrated that a reasonable factfinder would have to conclude otherwise. *See Glessing v. Commr of Soc. Sec.*, No. 21-1192, 2022 WL 457243, at *1 (2d Cir. Feb. 15, 2022) (citing *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012)); *see also Jesse L. v. O'Malley*, No. 24-CV-08219 (RWL), 2025 WL 2169562, at *2 (S.D.N.Y. July 31, 2025)

---

[9] As the Commissioner asserts, the ALJ was not required to analyze the conclusions by Stephen's treating physicians that he was temporarily disabled for purposes of workers' compensation since these are statements on an issue reserved for the Commissioner. (Comm'r Br. at 14-15.) Moreover, "the social security regulations define disability differently than the regulations for workers' compensation . . . and the ALJ is not required to give any weight to a workers' compensation assessment that does not pertain to an individual's functional limitations." *Vieira v. Comm'r of Soc. Sec.*, No. 18-CV-07205 (ER) (BCM), 2019 WL 8331457, at *3 n.3 (S.D.N.Y. Nov. 27, 2019), *report and recommendation adopted*, 2020 WL 1529963 (S.D.N.Y. Mar. 31, 2020); *see also Lopez v. Berryhill*, 448 F. Supp. 3d 328, 345 (S.D.N.Y. 2020) ("Regardless of the source, the opinion provided in a workers' compensation claim is not controlling with respect to a claim of disability claim under the Act.") (cleaned up).

(Even "if a court finds that there is substantial evidence supporting the Commissioner's decision, the court must uphold the decision, even if there is also substantial evidence for the claimant's position.") (citing *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010)).

## II. <u>Hypothetical To Vocational Expert</u>

In his "Statement of the Case" Plaintiff poses the question of whether a decision can stand when an ALJ disregards his own hypothetical to the vocational expert and disregards the vocational expert's testimony that there were no jobs the claimant could perform based on the hypothetical. (Pl.'s Mot. at 2.) However, Plaintiff does not address this argument further nor apply it to the facts of this case. In any event, contrary to Plaintiff's suggestion, the ALJ did not disregard her hypothetical to the VE nor ignore the VE's testimony that there *were* jobs that Stephen could perform.

"An ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as there is substantial record evidence to support the assumptions upon which the vocational expert based his opinion and accurately reflect the limitations and capabilities of the claimant involved." *McIntyre*, 758 F.3d at 151 (cleaned up). Because, as set forth above, the Court finds that the ALJ's RFC determination is supported by substantial evidence, the ALJ's hypotheticals to the VE reflecting the RFC analysis are adequate to support the ALJ's conclusion at step five. *See Simpson v. Comm'r of Soc. Sec.*, No. 24-1104, 2025 WL 1156973, at *2 (2d Cir. Apr. 21, 2025) ("Because the ALJ's determination of [the plaintiff's] residual functional capacity is supported by substantial evidence, his reliance on the vocational expert's testimony was proper."); *see also McIntyre*, 758 F.3d at 151 ("An ALJ may rely on a vocational expert's testimony regarding a

hypothetical as long as there is substantial record evidence to support the assumptions upon which the vocational expert based his opinion.").

Here, the ALJ's hypotheticals to the VE reflected the ALJ's RFC determination and the VE testified that such an individual could perform various jobs that existed in significant numbers in the national economy. (R. 53-59.) Rather than disregard the VE's testimony, the ALJ relied upon the VE's testimony in reaching a determination at step five. (*See* R. 21.) Accordingly, the ALJ's step five determination is supported by substantial evidence. (*See* Comm'r Br. at 17-18.)

III.    **Subsequent Favorable Decision**

Plaintiff also notes that he filed a second application for benefits, with an alleged onset date of October 4, 2022, in which a different ALJ reached a favorable decision and argues that the later decision shows that the ALJ in this case did not correctly review and weigh the evidence. (Pl.'s Mot. at 4-5.) However, to the extent that decision pertains to a different time period,[10] it is not relevant to Stephen's condition during the time period for which benefits were denied and does not bolster his claim that ALJ Singh's October 2021 decision was not supported by substantial evidence. *See Hairston-Scott v. Comm'r of Soc. Sec.*, No. 20-CV-00758, 2021 WL 3777581, at *2 (2d Cir. Aug. 26, 2021) (citing cases). Moreover, as the Commissioner argues, reasonable minds could reach different conclusions on similar evidence. (Comm'r Br. at 13-14.) Accordingly, Plaintiff's subsequent favorable decision does not imply that ALJ Singh did not correctly review and weigh the evidence and does not warrant remand of this action.

---

[10] The later decision is not part of the record before the Court. Regardless, Plaintiff does not assert that the later decision included any new evidence relevant to the time period at issue in this action. Accordingly, the Court agrees with the Commissioner that, to the extent Plaintiff may be seeking a sentence six remand, he has not demonstrated that remand is warranted. (*See* Comm'r Br. at 14.)

## <u>CONCLUSION</u>

For the reasons set forth above, Plaintiff's motion is DENIED and the decision of the Commissioner is AFFIRMED. The Clerk of Court is respectfully requested to enter judgment and close this case.

Dated:      New York, New York
              September 13, 2025

_____
STEWART D. AARON
United States Magistrate Judge